IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 23 C 2822 |
| ) | |
| OMAR GARCIA ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In 2020, following a five-day trial, a jury convicted Dr. Omar Garcia of six counts of healthcare fraud in violation of 18 U.S.C. § 1347. Garcia has filed a *pro se* motion to vacate his conviction under 28 U.S.C. § 2255, arguing that the jury was improperly constituted, his trial counsel was ineffective, and exculpatory evidence was hidden from him. For the reasons stated below, the Court denies the motion.

## Background

The charges in this case arose from Garcia's involvement with a company called Grand Medical, which was created for the purpose of defrauding Medicare. Grand Medical recruited doctors, including Garcia, to set up shell companies and register those companies with Medicare under the doctor's unique provider number. Grand Medical then sent nurse practitioners to provide home healthcare services to Medicare recipients. The nurses were instructed to order a large number of certain diagnostic tests, such as allergen tests, regardless of whether those tests were medically necessary. The idea was to order as many tests as possible without sounding alarm bells at Medicare. The nurse practitioners would arrive at a patient's home, order tests

regardless of whether they were medically necessary, and someone would arrive to administer the tests almost immediately. But Medicare would not issue payment for the tests unless they had been authorized by a physician. To ensure that Medicare paid out, Garcia signed off on the tests, despite never having seen any patients and despite the fact that the tests frequently had already been administered by the time Garcia received the patients' medical charts. Medicare was then billed for each test under Garcia's provider number, and Grand Medical paid Garcia a ten percent "commission" from each Medicare payment.

Garcia was charged with six counts of healthcare fraud in violation of 18 U.S.C. § 1347 for knowingly and willingly participating in a scheme to defraud Medicare by prescribing and authorizing medically unnecessary allergen tests. He was appointed counsel, pleaded not guilty, and proceeded to trial. During the five-day jury trial, the government presented witness testimony from a nurse practitioner, testimony from federal agents that had investigated Grand Medical and interviewed Garcia, patient medical records, testimony from patients' primary care providers, recorded interviews with Garcia, and other evidence.

Defense counsel's central argument was that Garcia was unaware of the illegal conduct Grand Medical was engaging in and did not know his Medicare number was being used to bill for unnecessary tests. Counsel argued that Garcia did not order or administer any tests or pressure anyone to do so; rather, he was merely a supervisor who justifiably relied on the nurse practitioners' representations regarding whether the tests they ordered were medically necessary.

The jury found Garcia guilty on all six counts. Defense counsel then moved for a

2

judgment of acquittal or, in the alternative, for a new trial. Counsel argued that the evidence presented at trial was insufficient to show that Garcia "prescribed and authorized" the tests as stated in the indictment. *United States v. Garcia*, No. 18 CR 833, 2020 WL 3414985, at *1 (N.D. Ill. June 22, 2020). The Court denied the motion, explaining that "even though a charge is worded in the conjunctive, it may be proven in the disjunctive" and the evidence was sufficient to show that he "signed off on and thus authorized the tests after the fact, allowing them to be submitted to Medicare for payment under his NPI (national provider identifier) number." *Id.* Counsel also renewed several evidentiary objections and argued that Garcia was entitled to a new trial based on the fact that a juror had sent the Court an e-mail following the verdict expressing some hesitation with the outcome. The Court concluded that none of the grounds raised entitled Garcia to a new trial and denied the motion.

The Court then sentenced Garcia (represented by newly appointed counsel) to a below-Guidelines sentence of eighteen months' imprisonment. To determine an appropriate sentence, the Court considered, among other factors, the sentences of other participants in the scheme, including its leaders. Garcia appealed, but his appointed appellate counsel asserted that the appeal was frivolous and moved to withdraw under *Anders v. California*, 386 U.S. 738, 744 (1967). *See United States v. Garcia*, No. 21-1415, 2022 WL 1535378, at *1 (7th Cir. May 16, 2022). Garcia filed a response in opposition to the motion. The Seventh Circuit granted counsel's *Anders* motion and dismissed the appeal as frivolous.

On May 3, 2023, Garcia filed a timely motion to vacate his conviction under 28 U.S.C. § 2255.

3

**Discussion**

**A.     Jury composition**

Garcia first argues that he was denied his right to be tried by a jury "of [his] peers." Mot. at 5. He argues that "important issues concerning complex healthcare laws were discussed" during his trial but that "[n]one of the Jurors were Doctors, Nurse practitioners or healthcare professionals." *Id.* The government argues that Garcia procedurally defaulted this claim because he failed to raise the issue at trial or on appeal. The government further argues that Garcia's claim fails on the merits because he "has failed to show that his jury reflected anything other than a fair cross section of the community." Gov't Resp. at 15.

The Court agrees that Garcia has procedurally defaulted this claim by failing to raise it at trial and on appeal. *See Delatorre v. United States*, 847 F.3d 837, 843 (7th Cir. 2017) ("Any claim that could have been raised originally in the trial court and then on direct appeal that is raised for the first time on collateral review is procedurally defaulted.").

Even setting aside the procedural default, however, the Court concludes that Garcia's claim fails on the merits. Although the phrase "jury of your peers" is common parlance, this phrase does not appear in the U.S. Constitution.[1] Rather, the Sixth

---

[1] The phrase is often traced back to the Magna Carta's guarantee that no man would suffer punishment without "the lawful judgment of his peers." *See Magna Carta: Muse and Mentor*, Library of Congress (Nov. 6, 2014), https://www.loc.gov/exhibits/magna-carta-muse-and-mentor/trial-by-jury.html. The purpose of this right was to "prevent the king's domination of the courts" by "forc[ing] the king to delegate part of his judicial authority to men who were peers [i.e., of the same rank] of the individual on trial." *Id.* Nowadays, in a country that at its founding abolished titles of nobility, *see* U.S. Const., art. I, § 9, cl. 8, "rank" and "peerage" are not understood the same way as they were in thirteenth century England. The best modern understanding of the phrase "jury of one's

Amendment guarantees a right to "an *impartial* jury." U.S. Const. amend. VI (emphasis added). The Supreme Court has emphasized that defendants are not entitled to "a representative jury (which the Constitution does not demand), but an impartial one (which it does)." *Holland v. Illinois*, 493 U.S. 474, 480 (1990). "[T]he traditional understanding of how an 'impartial jury' is assembled" is through a jury "drawn *from* a fair cross section of the community." *Id.* (quoting *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975)). Moreover, as long as the jury is "drawn from a source fairly representative of the community" and "the jury wheels, pools of names, panels, or venires from which juries are drawn [do] not systematically exclude distinctive groups in the community," there is "no requirement that [the jury] actually chosen must mirror the community and reflect the various distinctive groups in the population." *Taylor*, 419 U.S. at 538. "Defendants are not entitled to a jury of any particular composition." *Id.*

Thus, to make a prima facie showing that the government violated his right to trial by a jury drawn from a fair cross section of the community, Garcia must show that "(1) the group allegedly excluded is a distinctive group in the community, (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process." *United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014). Garcia has not hinted at any evidence, and the Court has no reason to believe, that healthcare workers constitute a distinctive group that was systematically excluded from the jury

---

peers" is that it means "a jury selected from a representative cross section of the entire community." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1402 n.47 (2020).

5

pool from which Garcia's jurors were selected. To the contrary, several potential jurors stated during voir dire that they were healthcare professionals. *See, e.g.*, R. 110 at 73 (doctor); *id.* at 95 (nurse); *id.* at 99 (medical assistant). Garcia therefore is not entitled to a new trial on this basis.

**B.     Ineffective assistance of counsel**

Garcia also argues that his trial counsel was ineffective for various reasons. "The Sixth Amendment right to the assistance of counsel is a right to *effective* assistance." *Gonzales v. Eplett*, 77 F.4th 585, 591 (7th Cir. 2023). The Supreme Court has established a two-part framework for evaluating ineffective assistance of counsel claims. First, Garcia must show that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). This is a "tough standard to meet" because "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Gonzales*, 77 F.4th at 591 (quoting *Harrington v. Richter*, 562 U.S. 86, 104 (2011)). Second, Garcia must show that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. To meet the prejudice requirement, Garcia must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

**1.     Limited interaction before trial**

Garcia first argues that trial counsel was ineffective because they met for less than one hour in preparation for the trial. Even if the Court assumes that this is true,

6

Garcia does not explain how the limited time with counsel prejudiced his defense. The fact that his attorney did not spend significant time meeting with him does not necessarily mean that his attorney did not spend sufficient time preparing for trial. Without a showing of prejudice, this contention fails.

### 2. Charitable work

Garcia next argues that counsel was ineffective because he failed to rebut the government's "present[ation] of [him] as a greedy Doctor who makes thousands of dollars and lives in Sunny Florida" by presenting evidence of Garcia's charitable deeds, such as his operation of free medical clinics that provided services to uninsured and homeless patients and his volunteer work at a soup kitchen. But Garcia's counsel did, in fact, elicit testimony about Garcia's operation of a free medical clinic. *See* R. 111 at 140. Further, counsel made this precise point during closing arguments:

> What do you learn about Dr. Garcia? Running a free clinic for 1700 patients. But they throw up these big numbers and want you to think it's greed. They throw up these fancy charts with all these numbers about how much money he makes? He's running a free clinic. He actually left working for Grand because he didn't have time because his free clinic got busy. Helping the VA.

R. 114 at 55–56. Moreover, it is likely that any prolonged presentation of Garcia's charity work would have been excluded for lack of relevance and/or lack of significant probative value. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

### 3. Failure to explain roles of collaborative physicians and nurse practitioners

7

Garcia next argues that counsel was ineffective because he failed to explain to the jury the roles of collaborative physicians and nurse practitioners. The record plainly contradicts this contention. One of the defense's central arguments was that the nurse practitioners acted—and had the authority to act—independently, and that Dr. Garcia merely played a supervisory role in which he (1) did not prescribe or authorize any of the diagnostic tests at issue, and (2) was entitled to rely on the nurse practitioner's judgments about the medical necessity of the tests. For example, in his closing argument, counsel stated:

> [The government's] own witness, Mr. Banez, a nurse practitioner, took the stand and testified that under the State of Illinois, he has the authority to see patients as their primary care provider, he has authority to diagnose their problems in homes, he has the authority to determine their symptoms, he has the authority and the right to prescribe medication, and he has the authority and the right to prescribe diagnostic tests, including the allergy tests at issue here.
>
> But most importantly, what did he say under oath when he took the stand? Who determines medical necessity? He does, because he is the primary care provider. He is the person who is seeing the patient. He is the one that's determining what is and what is not medically necessary. . . . And he also told you that he knew that Dr. Garcia would rely on those physical examination notes and that Dr. Garcia had the authority to rely on them. He knows that all doctors rely on his notes. . . . He made those decisions, not Dr. Garcia.

R. 114 at 49–50. This argument was fairly presented to the jury.

Counsel also presented variations of this argument to the Court at trial and in a post-trial motion. *See, e.g.*, R. 113 at 219–20 ("Judge, the facts in this case are exactly inapposite of the scheme that's charged. Their witness . . . testified that it was the nurse practitioners that prescribed and authorized these tests. It was them who made the decision on whether or not they were medically necessary. . . . The testimony in this case is clear. It's the nurse practitioners who are ordering the prescription and

8

authorizing it, not Dr. Garcia."); *Garcia*, 2020 WL 3414985, at *1 ("In seeking a judgment of acquittal, Garcia relies on the fact that he did not order or prescribe the tests . . . . It appears to be true that others ordered the tests—specifically, nurse practitioners—but the government was not required to prove that Garcia prescribed the allergy tests in the first instance."). There is thus no basis to argue that counsel was ineffective for failing to pursue this point in Garcia's defense.

### 4. Decision not to testify

Garcia next argues that counsel "discouraged [him] from testifying." Mot. at 6. He does not explain why this advice "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 687–88. Regardless, Garcia cannot demonstrate that he was prejudiced by his counsel's discouragement. As the following exchange during the trial shows, the Court made abundantly clear to Garcia, and Garcia affirmed, that the decision regarding whether to testify was Garcia's alone, regardless of his counsel's advice:

> THE COURT: Your lawyer has advised me that it's your decision not to testify in your own defense; is that correct?
> THE DEFENDANT: Correct.
> THE COURT: Okay. So I want to make sure that you understand what your rights are. So do you understand that you have a right to testify in your own defense if you want to? Do you understand that?
> THE DEFENDANT: I understand that.
> THE COURT: And do you understand that you have the right not to testify if you don't want to?
> THE DEFENDANT: Correct.
> THE COURT: And, obviously, this is something that you get your lawyer's advice on, but in the final analysis, the decision is yours and yours alone. Do you understand that?
> THE DEFENDANT: Yes.
> THE COURT: In other words, if your lawyer says you can't testify, he's wrong; you can testify. If your lawyer says you shouldn't and you still think you'd like to testify, you are entitled to do that even if your lawyer advises against it. Do you understand that?

9

> THE DEFENDANT: Yes.
> THE COURT: And understanding all of that, is it your voluntary decision not to testify?
> THE DEFENDANT: Yes.
> THE COURT: Okay. I find that Dr. Garcia has voluntarily waived his right to testify.

R. 113 at 223–24.

Garcia has offered no reason as to why the Court should disregard his affirmation that he understood his rights and that he made an independent, voluntary decision not to testify. Furthermore, he has not explained how his testimony would have affected the outcome. There is thus no basis for relief based on Garcia's contention that counsel was ineffective because he discouraged Garcia from testifying at trial.

### 5. Shiforenko statement

Lastly, Garcia argues that his counsel "hid from [him] the fact that the 2nd owner of Grand Medical, Mikhail Shiforenko, had been prosecuted and he had given a statement about the scheme I was accused of being a part of" that "exonerates" Garcia. Mot. at 6. As an initial matter, Garcia does not identify what statement he is referring to. The government assumes the statement at issue is Shiforenko's grand jury testimony, in which he explained the fraud scheme at length and identified participants in the scheme. Garcia has not disputed this assumption in his reply, so the Court will likewise assume that the allegedly exculpatory evidence is Shiforenko's grand jury testimony.

Garcia does not explain, and the Court cannot see, how this testimony is in any way exculpatory to him. Shiforenko mentioned Garcia specifically only once in his testimony—to identify him as a doctor who worked for Grand Medical. *See* R. 78, Ex. B. at 95. Garcia seems to imply in his reply brief that this statement exonerates him

because Shiforenko did not name him as "a member of their inner circle or scheme." Pet.'s Reply at 3. But the government was not required to prove that Garcia had any leadership role in the scheme to prove the charges against him.[2]

Nothing else in the statement can be reasonably read as establishing, or even tending to show, Garcia's innocence. Shiforenko testified at length about how the fraudulent scheme operated and the role that doctors played. This testimony largely corroborates the *government's* version of events, not Garcia's. Shiforenko stated, for example, that the doctors knew from the outset that they were expected to sign off on a large number of tests that in fact *already* had been performed and that they would get a kickback for each test:

> Q: Did the doctors have an understanding of how they would be paid during this initial pitch?
> A: Yes.
> Q: And what was their—what did you and/or [Hovic] Zerunyan [Shiforenko's co-conspirator] tell them?
> A: It would've been commission based, ten percent of the billing.
> Q: So it was commission based, ten percent of the Medicare or insurance companies' billings?
> A: Correct.
> Q: So how were those billings generated?
> A: Through billing Medicare.
> […]
> Q: Okay. But they were billed --- what were they billed for?
> A: Doctors visits and 485s and most of the money was in the diagnostics.
> Q: Okay. Which the doctor would sign off on?
> A: Yes.
> Q: And the doctors knew that's where the money was coming from, correct?
> A: Yes, the bigger chunk of the money was from diagnostics. It was like

---

[2] As the Court instructed the jury, the government was required to prove (1) there was a scheme to defraud Medicare as charged in the indictment; (2) the defendant knowingly and willfully carried out that scheme; (3) the defendant acted with the intent to defraud Medicare, (4) the scheme involved a materially false or fraudulent pretense, representation, or promise; and (5) the scheme was in connection with the delivery of or payment for health care services. *See Garcia*, 2020 WL 3414985, at *1.

11

> 80 percent.
> Q: Did you and [your co-conspirator] tell the doctors that there were going to be a lot of tests, like this job would entail them signing off on a lot of tests?
> A: Yes.
> Q: And that – did you also tell them that these tests were going to be done pretty much right away after the patients were seen?
> A: Yes.
> Q: So to the extent that if a doctor didn't see a particular patient and a mid-level saw them, did that particular doctor understand that they were signing off on tests that were already performed before they even got the chart?
> A: Yes.

R. 78, Ex. B. at 98–100.

Shiforenko also testified that the doctors knew they needed to operate in a way that avoided raising "red flags" with Medicare:

> Q: Were – or did you and – and/or Zerunyan tell the doctors also that for their entities, they should not bill over, like, 80,000 to $100,000 to Medicare per month?
> A: Yes.
> Q: And why – why the cap?
> A: Not to raise – because everything over 100,000, that's – would raise a red flag and that will raise inspection.
> Q: Inspection of the business?
> A: Yes.
> Q: Like an audit?
> A: Audit, yes. The more you bill, the more chances you have to be audited.
> Q: Okay. Were the doctors aware that that was the reason why –
> A: Yes.
> Q: -- that they could not bill over the $100,000 cap?
> A: Yes.

*Id.* at 110. These excerpts demonstrate that Shiforenko's testimony very likely would have been prejudicial to Garcia's defense and that it most certainly would not have been exculpatory.

In sum, the Court concludes that none of Garcia's complaints about his counsel's performance meet the *Strickland* standard for ineffectiveness, either separately or when

12

all of the complaints are considered together and counsel's performance is assessed as a whole.

**C.     New evidence**

Garcia argues that the Shiforenko statement was "never admitted as evidence during [his] trial" and that it was "hidden" by both the government and defense counsel. Mot. at 8.  The government has represented—and Garcia does not dispute—that Shiforenko's grand jury testimony was produced to defense counsel in pretrial discovery.  That leaves only Garcia's assertion that counsel "hid" the statement from Garcia and failed to introduce it as evidence at trial, which the Court has already addressed with respect to Garcia's ineffective assistance of counsel claim.  As the Court has explained, nothing in the Shiforenko statement is exculpatory or exonerating.  There is therefore no basis for arguing that Garcia was in some way prejudiced by the fact that this testimony was not introduced at trial.

Finally, Garcia argues that the Shiforenko statement was "brought up" at sentencing but was "brushed off" by the Court.  Mot. at 8.  This argument is procedurally defaulted because Garcia declined to challenge his sentence in his appeal to the Seventh Circuit.  *See Garcia*, 2022 WL 1535378, at *1 ("[C]ounsel tells us that Garcia informed her that he does not wish to challenge his below-Guidelines sentence. Because Garcia does not dispute counsel's representation, further discussion of the sentence is unnecessary.").  Garcia has not shown cause or prejudice for excusing this default.  And even if the argument were not defaulted, it is meritless.  As the government points out, Garcia's counsel referred to the Shiforenko testimony and argued as a mitigating factor the fact that Garcia was not one of the masterminds

13

behind the scheme. The Court *expressly* took this into consideration when determining Garcia's sentence. The Court stated, for example:

> So first of all, I don't think anybody disputes that he didn't set up a scheme. It was set up by other people, Mr. Shiforenko and the other gentleman, who I think is still a fugitive. . . . Dr. Garcia didn't set up, didn't set it up, he didn't decide how it was going to work. . . . It's also true, however, that – as the government says, that something like this doesn't work unless there are people like Dr. Garcia who participate and who do so willingly.

R. 149 at 53–54. Moreover, the Court expressly considered the length of Shiforenko's sentence and his relative culpability in determining Garcia's sentence:

> So I think the guideline range of 51 to 63 months is excessive. It's not as excessive as the one that had been proposed, which I thought was way out of whack, particularly because it was even greater than what Mr. Shiforenko got. And I acknowledge that Mr. Shiforenko cooperated, but there would be kind of a basic level of injustice, I think, given the scope of his involvement and the scope of his fraud, which extends way beyond what Dr. Garcia's involvement was for him—for Dr. Garcia to get a sentence, frankly, even close to what Mr. Shiforenko got.

*Id.* at 60–61. There is thus no basis for arguing that the Court failed to consider the "new" evidence that Garcia cites.

## Conclusion

For the reasons discussed above, the Court directs the Clerk to enter judgment stating: Omar Garcia's motion under 28 U.S.C. § 2255 is denied [dkt. no. 1]. The Court declines to issue a certificate of appealability because it can find nothing to suggest that the merits of the claims that it rejected are debatable, capable of different resolution, or deserving of further consideration. *See* 28 U.S.C. § 2253(c)(2); *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *Porter v. Gramley*, 112 F.3d 1308, 1312 (7th Cir. 1997).

Date: May 14, 2024

_____
MATTHEW F. KENNELLY
United States District Judge